I'm dividing my time this afternoon with Mr. Franklin, who represents Southwest. We're both prepared to address all the issues, but because standing is the threshold issue, I'm going to cover that. We're both prepared to take any questions that you may have. Across 200 million tickets and 562 days, the plaintiffs still haven't managed to identify anyone who has an injury, a concrete injury, much less one that can be proved with common evidence that, as this court said at the stay stage, is fairly uniform across the various routes and times. I guess sort of a devil's advocate point here is, as I understand it, the injury that's alleged is just your garden variety economic injury, fraudulent conspiracy, the tickets were inflated, so it's an out-of-pocket injury. Why isn't that just a textbook Article III injury? Economic injury is a textbook Article III injury, but you still have to establish that the plaintiffs were themselves born that injury, and that's what they failed to do, I think. Under this court's decision in Rivera, where what you have is a satisfied customer who bought a product or service, completely consumed it, was entirely satisfied with it, you can't then go back and say, due to some market forces, if, for example, a different warning had been given, those would have been the facts of Rivera, if a different warning had been given, that would have decreased demand and indirectly caused the price to be different. Mr. Jay, can I ask you to pause you on that for a second? Imagine for me a quintessential civil RICO suit. So there's one dry cleaner in town paying protection to a group of unsavory characters who are then preventing other dry cleaners from opening in town, committing all manner of RICO predicates to protect the paying dry cleaner. The dry cleaner's charging four bucks a shirt because it's a monopolist in town and is able to do so. So a consumer brings a civil RICO suit and sues the defendants and says, because of your pattern and practice of RICO activity, you are preventing new dry cleaners from opening in town, otherwise I would have paid two bucks a shirt. It would be no answer, I assume you would agree with me, to say, well, you got the service you paid for. You got clean shirts. You consumed the free shirts. What's the problem? You would agree with me, I assume, that that particular plaintiff who overpaid because of the pattern of practice would be injured, in fact? I would, because they're directly paying a super competitive price. And how is that any different? It's a matter of directness, I think, directly to the defendant. So there would be no dispute that that person is a person paying the super competitive price. In this case, the plaintiffs can't identify who in the class they think would have been the drop in demand. And how is that not an ascertainable problem? Because you can imagine, I guess this is another question I don't understand, is imagine instead of it being a class, it's just one person, right? Just name a particular plaintiff who says, I really, really, really care deeply about safety in airlines, and my price I'm willing to pay to go from here to back to Austin is $200, unless it's on a risky airline, at which point I'm only paying $100. That's the allegation. So it's just one plaintiff. There's no ascertainability problem. How is that plaintiff not injured, in fact, by the fact they didn't know about the risk? So that plaintiff would have to establish that but for the conduct, the economics of the airline industry would have caused him to pay a different price. So it can't just be his own subjective preference. Now I think that in the context of the airline industry, and I think the facts of this case demonstrate that there, so Mr. Ringling is one of the named plaintiffs in this case who says essentially he waited until he got to the gate, and then when he saw that he was not going to be flying on a MAX, like 95% of the people in this class, he, and he said had a MAX rolled up, he would have paid a $200 change fee, right? So the point, I think, you can see is that you can't just say my preferences would have caused the airline to make available to me a ticket at a different price, right? And that, I think, is the disconnect between the plaintiff's theory as pleaded, and also their, like the theory that their demand side conjoint expert is putting forward, that they're relying not on a direct purchaser-seller overcharge with the purchaser using monopoly power to But the idea that some of the people in the class would not have flown, that would have decreased demand, and indirectly that would have forced the airlines to offer different prices. I don't think they can establish the conclusion, but they also can't even identify which members of the class would have paid the price, and which would not have flown, and if they had not flown, what they would have done in the alternative. So I think that's really what differentiates this from your direct purchaser hypothesis. So suppose I agree with every single thing you just said, and that it's just, because what I'm hearing is ascertainability, right? It's impossible to pick that person, that particular plaintiff. They would have paid less, or what the market consequences would have been as to that plaintiff. I don't think that that's just an ascertainability problem. I think that it is first and foremost a standing problem, because they can't identify, even as to the name plaintiffs, they can't identify whether any of the name plaintiffs would in fact be sent less in the world that they characterize as the but-for world. But even if you thought that one of the name plaintiffs had pleaded standing, it would not only be an ascertainability problem, but more fundamentally, it's a problem that can't be solved by changing the class definition. That means it's fundamentally a predominance problem, because you can't prove this overcharge by class-wide evidence, and you certainly can't prove who's injured and who's not injured, even if you spot them pleading standing at the 12v1 stage, because Dr. Allenby's model is just, as I said, a demand-side model. Dr. Allenby is a marketing expert, not an economist, and he just doesn't take into account the economics of the airline industry. I think the clearest illustration of the fact that his model can't identify who's injured and who's not is that he said that he was assuming that there'd be one price across the market. He rejected the idea that he needed to model each individual origin and destination pair. But that's the market in the airline industry. You're not competing. If you're flying from Bangor to Seattle, you're not competing with people who are flying from Miami to Phoenix. The competition is on a particular route. There are routes where there was only one nonstop for large portions of the class period. There are purchasers who had a guaranteed fixed rate throughout the class period. So none of those people can show that they would have been affected in any way by the supposed drop in demand. Just the same fundamental point. Just because the planets claim there would have been a dip in demand does not mean that the airlines would have been forced to adjust their prices to give the planets the different price that they assume. That's the standing problem. It's also the common evidence problem for predominance purposes. And unless the court wants to boot me off of this, I do want to pursue the predominance point a little bit because it is not just that the current report that the expert has put in is inadequate, although it is. It's not just that it is inadmissible at Daubert. It's not just that it can't satisfy Comcast. It's not even fixable because, as he admits, the expert admits that he does not think he could do the number of conjoint surveys even to estimate demand on the different origin and destination pairs that are at issue in this case. And he suggested that he couldn't even do it if Southwest had 100 origin and destination pairs, and he's off by more than an order of magnitude. So the planets have had multiple chances. They had actually multiple experts come in. They had an airline expert who actually was an economist come in, but they decided not to rely on him at the class search stage, and I think it's quite clear why, because Dr. Bruckner agreed that lower demand does not necessarily mean lower fares in the airline industry. That testimony is at 17, 9, 15 to 16 of the record, and given that one of their own experts made this point, given that our experts confirmed the point, given that Dr. Allenby had multiple chances at what he was attempting to prove. So he had his initial report, the plaintiffs asked the district court for leave to submit a supplemental report, and they said that their entire class certification case hung on Dr. Allenby. This is in, I don't have the exact page. In the district court's order granting leave, the court acknowledged that the plaintiffs had represented that without Dr. Allenby they could not get a class certified. And all he submitted was this supplemental report that amounts to a promise to fix the identified deficiencies in this report. Now under Bell Atlantic, under Krusen, and under Prantill, that is simply not good enough. It's not good enough to satisfy Dawbert, but we also know that Comcast requires more than just Dawbert. Comcast, after all, was a case in which the Dawbert objection was forfeited, and the methodology still was deficient. So we think that the standard of review did not help the plaintiffs here, but even if it did, it would be an abuse of discretion to have let this expert in, and there's certainly no way to fix it at this point. And that's without getting into the ascertainability problem, Judge Olin, that you raised with your questions. You are claiming that this is similar to a Rivera situation, is that right? We are. For standing purposes, we don't see a material difference between that. That was my next question, trying to be precise. Is this identical to Rivera, or is it simply a takeoff of Rivera? Is it similar enough that we should follow Rivera, or is it absolutely identical? It's not absolutely identical, but we don't think there's any distinction that makes any difference. We're just going to go into the difference so that we can understand if we were to agree with you, how would we articulate that? Right, so the first difference is that these plaintiffs are asking for some of their money back now, and not all of their money back. I don't think that that is a relevant distinction. The fact that this is a RICO case is not a relevant distinction. There was a consumer fraud claim in Rivera. I think that it really does boil down to the question of whether there's any difference between the supposed representations to the market in this case, and the supposed warnings that the plaintiffs in Rivera claim could have been put on the drug. We don't see any difference, and the cases that have followed this court's decision in Article III, you can't, as construed in Rivera and similar decisions, by saying, I'll have an expert come in and say that if you provided more warnings, that would have caused demand to drop, and I would have paid less. The district court seemed to think, on this point, that Cole was the more apposite case and not Rivera. What's your response to that? So Cole is a lot like Coghlan, which is the decision before Rivera that Rivera distinguished, and I think that both of those cases are benefit of the bargain cases, in which you wanted a boat with a fiberglass hull, you got a boat with a plywood hull in the middle, or you wanted a car with a functional airbag, you didn't get what you bargained for, you didn't get a car with a functional airbag. So I think that really is the difference, where you're getting a durable good, and you didn't get what you bargained for, and so you discover that it has less value than you paid for it. That's different than in the case where you get a consumable good, it was exactly what you bargained for, and you consumed the whole thing, and then you say afterward, I wish that because of market forces, I could have paid less. Do you have a case that makes this consumable good versus durable good distinction? I don't think specifically, I mean, I do think, and this is the third distinction I wanted to give to Judge Smith, but it's responsive to your question as well. This is an airline case and not a pharmaceutical case, and I think that the pricing in this case and the working of the market forces, there's just a greater degree of remoteness between the supply and demand curves in this case. So I don't have a case that deals directly with the consumer good thing, but I do think that benefit of the bargain damages, that's a pretty well-established concept that when you get something, and then you find out something that causes its value to diminish, that means its resale value has diminished, and that seems more like regular Article III economic injury, whereas what we're talking about here is, but for the defendant's actions, I would have paid a different price based on my supposition about the workings of the market, and that's what's not been established here. I see that my red light is on all of this. You've saved time for a moment, Mr. J. Thank you, Your Honor. Franklin? Thank you, Your Honors, and may it please the Court, Jonathan Franklin, representing Appellant Southwest Airlines. We agree with the arguments that Mr. J has just put forward. In my time this afternoon, I would like to focus on the reasons why the plaintiffs not only have not but cannot satisfy, through evidence rather than just assumptions, their burden to show that every element of Rule 23 has been met, and in particular, I wanted to further elaborate on why the plaintiffs, again, not only have not but cannot show that individualized issues would not predominate over common questions, particularly given that their principal expert, Dr. Allenby, has failed to put forward a workable class-wide model of either injury or damages, despite having had multiple opportunities to do so over more than two years. In the Court's decision in Castano, the Court said not only that the class certification was improper, but it also directed that the case not proceed on a class basis, and I think that's appropriate here, perhaps even more appropriate, because the plaintiffs have had multiple opportunities. Dr. Allenby had a supplemental report, and that was over more than a two-year period, and given the paucity of the evidence here, I do not think it would be possible on this record, which is the only record we're going to have since class certification, class discovery  And I just wanted just to reiterate some of the points. I don't want to repeat things that Mr. Jay said, but this is not merely a battle of the experts here. We have testimony from their own expert, Ms. Dr. Allenby. He conceded that he just merely assumed that the price premium that he calculated would not vary from root to root, and that's at pages 11589, 11607, that he did not attempt to calculate those premiums. Then he said that he believed that the price premium would, in fact, vary across roots. He was asked, and he was answered, and he said, yeah, I think it would, and that he has no idea that to the extent to which it would, and that it could be, in fact, significant variances. That's at page 11622. And while Dr. Allenby is not even an economist, he's a marketing expert, the plaintiffs actually did have an airline pricing economist as their expert, Dr. Brookner, and he, they stopped relying on him because he agreed with our experts, and you can find this at pages 17915, that quote, there is no uniform fair discount that would apply to every Southwest passenger who flew on a MAX. Now this is all testimony from their experts. Of course, our experts said the same thing, but again, I just wanted to emphasize, this is not just a battle of the experts here. And in its preliminary decision granting a stay in this case, the court quoted and, in fact, relied on the Supreme Court's holding in Comcast that where individualized questions would, going to damages, would overwhelm common questions, no class can be certified. And the court held, again, as a preliminary matter, and I know Judge Oldham, you were on that panel, the court held as a preliminary matter that the defendants were likely to meet their burden to show, and I'm quoting here, that the price deflating effect of public knowledge of the MAX defects would have been fairly uniform across all of the various routes and dates involved in this lawsuit. Now even though the plaintiffs were on notice when they did their merits briefing that this was a significant issue in the case, I do not believe there is anything in their merits brief that should change the court's analysis at this stage of the appeal. As Mr. Jay has noted, and as the record reveals, and frankly as anyone who has ever bought an airline ticket knows, airfare is an extraordinarily individualized market. It varies from route to route, but also varies within routes, such that two people sitting next to each other on the very same flight may pay very different amounts. If that were the case, could we ever have a conspiracy claim where the damages alleged were inflated airline prices, given what you just said about the variability of airline prices? I think it would be impossible to have one like this, Your Honor, and I would question whether it could be done ever on a nationwide basis. If you were going to postulate a specific flight, for example, I might, maybe, I don't know. Again, I don't know. I'm not asking you to argue against yourself, but I'm just asking if the rule that you are advocating here would simply wipe out. No, it wouldn't wipe it, I mean, again, if it was a fixed fee that they were paying, for example, there was an argument that there was an excise tax or some sort of a fixed fee that was put on that, that might be a different issue. And again, we're talking about an expert here who, again, is not an economist, who by his own admission was just modeling the change in demand. That was what his conjoint survey was doing. He didn't interview a single person who actually flew. Well, with respect to the substance of the expert report here, I mean, we're not up here on a Daubert issue. What exactly are we reviewing with respect to the expert? I think we are reviewing whether the, as in Bell Atlantic, as in Comcast, as in Cruzan, whether the expert has put forward a workable class-wide model of damages and injury. It's not just damages, because it also goes to injury. He's conceded that there might be a no-price premium, he said, on many routes. So the question is, has he put forward a class-wide model that can show us injury and damages on a class-wide basis? And he clearly has not, by his own admission. So we would ask that the court either reverse with instructions to dismiss the complaint for lack of standing, or in the alternative, reverse the class certification order and direct that this case can proceed only on an individual basis, if at all. That there should not be another, say, bite at the apple, I think is what I'm trying to explore here. If the court has no further questions. Can I ask one question? Yes, sure. About the consequences of those two different dismissals. So we obviously have precedent that says we do jurisdiction first. We always do jurisdiction first. We even have precedent that says we do jurisdiction first in Rule 23 F appeals. But I'm curious, if we did the second thing you said, which was that we reach the merits, we find standing, we reach the merits, we reverse, and we say this case can proceed only on an individualized basis, I assume that does nothing to reach the merits or prejudice the plaintiffs, either named or unnamed, in any way. I'm having a difficult time understanding what the consequences, the jurisdictional consequences would be for the second one. Do you see what I mean? We're still not exercising judicial power over anyone. We're decertifying a class and we're allowing the case to proceed. If the court found that there was no standing for the named plaintiff, then it has to direct dismissal of the case. Which would be without prejudice, right? Because those plaintiffs, right, there's a dismissal without prejudice, we don't reach the merits, those plaintiffs could refile, right? Depending on the courts. I mean, I don't think they could refile this case, Your Honor. Of course not. But every jurisdictional dismissal is without prejudice. Yes. And so what I'm trying to understand is what would be the consequences of the second thing you suggested? I certainly understand the first one you said. I guess that would be on the assumption that the court has found, at least at the pleading stage, that the plaintiffs have stated standing, have shown standing. So the second one would say to reverse the class certification order. What I'm saying is, to do what the court did in Castano, which is not only to reverse that but direct that the case, as in Castano, that the class allegations in the complaint be dismissed. There would be no jurisdictional element to that, as far as I can tell. Well, there would be in the sense that you would find jurisdiction in order to do that. You have to. I mean, I wish I could say no, but I think Steel Company tells me that you would have to do that, at least as to the named plaintiffs. Now, let me just say, as to unnamed plaintiffs, I don't think that, you know, we have an argument that they have not shown that unnamed plaintiffs have standing. And that's exactly where I was going with this. So we would say, what exactly would we say as to the unnamed plaintiffs? I suppose you would say we would have to find jurisdiction as to the unnamed plaintiffs in order to do the second thing you asked? No. No. Because at least most circuits, I don't know if this court has held it, said that all that's required for justiciability is that the named plaintiff or at least one named plaintiff have standing. So the unnamed plaintiff actually goes to the Rule 23 issues. So every circuit has held that where there is a large number of unnamed plaintiffs who lack standing, that defeats class certification. This court has not resolved whether one plaintiff is enough, and I believe Judge Duncan, Your Honor, has opined on that. But in this case, it doesn't need to reach either, because it is clear that there is a large number of unnamed plaintiffs who would lack standing. Now, that I don't think is a jurisdictional issue. I think that's a Rule 23 issue, but it gets you to the same place. No class can be certified, because in order for them to show that these unnamed plaintiffs have standing, and I'm talking particularly about the ones who wouldn't have flown at all, they would have to show on a case-by-case basis who would have flown and what they would have paid. And they can't do that without defeating predominance. So you get to the same place, but I don't think it's jurisdictional, if I'm responding to the court's ruling. That's exactly the question. Thank you. Any other questions, Your Honor? Thank you, Mr. Franklin. All right. For the appellees, I'm going to let you pronounce your name, because otherwise I'll mess it up. Thank you, Your Honor. Your Honors, and may it please the Court. My name is Yavar Batahi. I'm here on behalf of the plaintiffs and members of the classes. Your Honors, I'd like to begin with the jurisdictional issue. And what you heard from defendants is an unprecedented theory of Article III jurisdiction, and let me explain why. If airline CEOs got together in a room and decided to fix the price of airline tickets, defendants would say, there's no Article III jurisdiction if you took the flight and arrived safely. And you can see, Your Honors, there's something unresponsive to the theory of injury, to this argument, because the injury doesn't flow from the effectiveness of the product. It flows from defendants' fraudulent conduct. And in fact, Your Honor, that's exactly the theory of harm alleged here, which is that a pattern of racketeering based on mail-and-wire fraud proximately caused the price inflation. Now, it's not responsive to say, well, you got the flight, so you got everything that you paid for. Just as in a price-fixing case, if you buy price-fixed milk, it matters not at all if the milk was spoiled, if the milk was spilled, if you drank it, it makes no difference. You paid too much. You paid a price that was inflated with unlawful conduct. And that's a simple form of Article III jurisdiction. And in fact, Your Honor, defendants cite the Third Circuit in support, particularly in their reply brief, but they don't mention that the Third Circuit has rejected this precise argument in the context of a RICO overcharge in NREA Avandia, and I can provide the site. That's 804 F3rd 633. And there, Your Honors, the drug Avandia was the subject of a RICO overcharge suit. And defendants argue just as these defendants do here, that you got the drug, it worked, so you could not have been injured. And the court said, well, no, the injury doesn't flow from the effectiveness of the drug. It flows from the fraudulent conduct that inflated the price. And the court gave the same exact antitrust example that I gave the court here. And the reason, by the way, Your Honors, antitrust is particularly on point, of course, is because the RICO statute is the sister statute of the Clayton Act. It was modeled after the Clayton Act. It's meant to work in similar ways, where the causal nexus is not reliance. It's proximate cause. And it has to be directness for that proximate cause. So, which brings me, Your Honor, to the point about Rivera. The RICO statute itself is a huge point of distinction from Rivera. Because in Rivera, no one identified the source of injury. This is the point Cole made. No one explained the mechanism of the price inflation. The plaintiffs just showed up, said, I didn't get enough warnings, so I need to be compensated. It's impossible in a RICO case. In a RICO case, we have to show that the pattern of racketeering proximately caused an injury to business or property. There is no way to prevail in a RICO case without proving, pleading, an injury to business or property at every stage in the litigation. That means the Lujan Directive that the class must meet all the burdens at every successive phase of litigation must be met, necessarily. And the Supreme Court made this point about RICO in its Holmes versus Sipic decision. It says injury to business or property is a form of injury in fact. In fact, it is a narrow form of injury in fact. Not all injuries work under RICO. For example, you couldn't have personal injury under RICO. It has to be the tangible economic harm. So if we don't prove that point, we don't prevail. And that brings us to, I think, a very important rule that this court has followed since the 1946 decision in Bell versus Hood, which is when you have an element of a claim that's intertwined with the question of subject matter jurisdiction. An attack on that element is treated as a merits question. It's not rendered as part of a subject matter jurisdiction question. And your honors can see exactly why, because at the onset of every case, you would have to, if we applied this rule that defendants contend is the rule, we'd have to not only ask, were you injured from repriced inflation? We'd have to have a little mini trial at the beginning of every case and ask, well, did your bargain fail? Did you get what you paid for? And we'd have to do this at the beginning when we have no discovery, we have no evidence. And that's obviously not an efficient use of the court's resources. If a case with intertwined element of jurisdiction fails, it fails. There's no reason to reach the subject matter jurisdiction question that surrounds it. Your honors, I do also want to point out the briefs are pretty consistent about trying to redefine the injury in this case. And I do want to reject that for two reasons. One, we do actually have allegations replete in the complaint, particularly the sections involving RICO, that are clear that we're talking about a price inflation, that nothing has been changed since the original theory of the case with respect to the RICO claims. There are citations in their briefs to claims that were dismissed and those theories of injury, some of which were products liability theories. They were dismissed on Rivera grounds, correctly, by the district court below. And I do want to make a broader point. And this point bears on the point that if you allow this case to go forward, everyone will sue on bad news. And it's sort of strange, because bad news doesn't make a fraud case. And a fraud case doesn't make a RICO case. RICO cases are hard to plead and prove. They're incredibly rare to have viable ones. I've had many dismissed on the defense side. They're very hard to break. And the notion that allowing a RICO case that's meritorious to go forward because a price inflation didn't also accompany the failure of the bargain, that doesn't follow. I don't see how someone can bring a tort, for example, because this court finds that a price inflation is On that point, Your Honor, I do also want to add. If Your Honors have no question on the jurisdictional issue, I can move on. I have one. I just want to make sure you've gotten it out. As I understand the theory, the response to the fraud, the way that the market was supposed to respond to if the fraud had been disclosed, is that Southwest Airlines would have continued flying the planes, but discounted the price by x% to compensate people for the additional risk of the MCAS failures. Am I understanding the theory of injury, or the theory of price, you put it, price inflation? Yes, Your Honor, with the caveat that it's not a unilateral decision by Southwest, right? They may not be able to bear out a price above a certain level for the product they offer. It's a demand and supply. It's what demand and supply meets. And the notion is that with additional information about what they've suppressed using the fraudulent conduct, demand and supply meet at a different price. Right. And so the theory is that if the market had all the information, the price would have come down, either because the demand would have dipped or because of some other market force. But somehow the price would have decreased from x to x minus y with full information. Am I understanding it? That's right, Your Honor. So here's my biggest hang-up on your theory of standing. Why is not the most probable outcome of this entire proposition that if the information had been disclosed, the planes would have been grounded, exactly like we know did, in fact, happen? And if that's true, when it eventually was disclosed, that's the immediate response. It's not, yes, we've got planes. It has an MCAS problem. There's some risk that you might fall out of the sky and die, but we're going to give you an x, or my hypothetical, a y delta on your price charge. Instead, what any reasonable airline would do would be to at least temporarily ground the planes while they identified what the problem was and everyone sorts it out. And if that was the result, if that was the defendant's outcome, then the prices actually would have gone up. There would have been fewer planes. They would have had to shuffle things on routes. And ticket prices would have gone up. It would have been the opposite. In fact, you got a break on the prices. Well, Your Honor, I have two points in response to that. That sort of creates problems for virtually any fraud case where it's either criminal or self-concealing. I mean, you can imagine a pyramid scheme. I mean, you could say about if you're defrauded by a pyramid scheme, like in Torres. Well, if everyone knew about it, it would have collapsed, and the cops would have come, and there would be no pyramid scheme. And I think that doesn't leave the fraud victim. Well, in pyramid schemes, at least someone loses money by definition. And so that's the person who's injured in their property, if it's Civil Reco, or in just normal Lujan terms, that's the person who's injured in fact. But the hypothetical that you and I are discussing in this moment is that, in fact, no one is injured in their property because the prices would have gone up if the fraud had been disclosed because there would have been fewer planes for Southwest to fly. They would have laid out hundreds of millions of dollars on these planes and not been able to fly them. They would have had to adjust their routes, adjust the entire system, and increase prices to have to compensate for it. Well, Your Honour, our project here in a case like this, trying to figure out how much to compensate a fraud victim, is not to imagine an alternate universe. It's to create a but-for world that allows us to find that delta. And economists, the but-for world, including securities cases, is really just what would have happened if the information was not... We don't then go speculate about whether the FBI would have showed up, whether the factory would have blown up. That's not really the project of the economist, right? The economist is asking, if the truth were known, what would the price effect have been? But that necessarily involves some inferences. Right, and so, as you know, the Supreme Court has been adamant with us when we were trying to identify an injury in fact, Clapper being perhaps the most canonical case, that we can't just continue to pile inference upon inference and continue to pile link upon link to the chain because eventually it becomes so speculative that it is no longer concrete and actual or imminent. It is instead speculative. And so it does actually pile back into whether you have an actual concrete injury in fact, or whether the injury that you're identifying in this sort of price inflation theory is just speculative because it requires us to infer what Southwest would have done in your economist's but-for world. Well, Your Honor, we don't need to infer what Southwest would have done. After the second crash, they refused to ground the plane. They went days without grounding the plane. They didn't do it voluntarily. The government did it eventually. And so, how do you see it? It still piles back into the same problem, which is like... Your Honor, what we're trying to figure out is the mismatch, the delta between the economic value at the time the ticket was paid, right, and the amount paid. We're not trying to imagine what would have happened in an alternate universe. We're trying to measure an economic value spread at the time of purchase. Not later, not in an alternate universe. And it's very hard, if Your Honor is correct, that we then always have to speculate. This is true for every fraud case. Impossible to measure fraud damages in those cases if that were the case, especially when you have egregious conduct that probably wouldn't propagate if the truth were known. Did you, in theory, assume that a plaintiff who, knowing about the MCAS problem, would have still purchased a ticket, albeit at a discounted rate? Well, Your Honor, that's an interesting question. Let me back up for a second. No, no, it's a tough one. When we're talking about the price inflation, in here we're talking about a third-party fraud-based price inflation, or a third-party reliance-based price inflation, not first-party. So, theoretically, you could have a price inflation regardless of the expectations of the person buying, what they knew, what they cared about, their bargain. That's possible. But more to the point, it's counterfactual, because, for example, the material on page 32, 33 is still sealed, and you can see how that would depress the price, or the stuff on page 35, 37, no one knew that. And I don't think there's a dispute that that information is still unknown to the public. So, it's a situation we didn't really grapple with. But it is possible, Your Honor, that independent of the subjective expectations of the purchaser, that the price inflation occurs. In a securities case, you may not know that you're overpaying for IBM stock until after the revelation of the truth, and you have a drop. But you are injured when you purchase that stock. And it's the same concept. You need not be aware that IBM is, for example, cooking its books. I'm just curious, did you allege in the complaint something to the effect that, look, they would have bought the ticket had this all been disclosed, but they would have just bought it at a lower price? Yes, Your Honor, there were two theories, as the statistical court noted in the complaint. And some were more tailored, I think, to some of the claims we brought were unfair competition law claims. And those don't necessarily require... Some don't require causation from different states. And the theory there was, I wouldn't have purchased, and so I should get some form of rescission. Yeah, that's the one that's out on that. That's out. Now, there's alternate pleading, including the Costa Rico, and that is we paid too much. Now, it's possible that the ticket was worthless, and we say that. That's just a complete overcharge. But we also say either some or too much that we paid. And that's all over the complaint. It's been there from the beginning. And, you know, in the district court, you can see from the briefing, it was the only theory really briefed and heavily briefed at the motion dismissed. It's a theory that we've been going on for two and a half years. And if the district court judge thought it was unclear, he could have asked us under 15B to have amended, and he didn't. There's no failure of notice on that front. Your Honor, if there are no more questions... I thought that your complaint said that none of the plaintiffs would have bought a ticket to potentially fly on a plane that Southwestern Boeing knew was fatally defective. Is that right? Is that in the complaint? That's one of the theories of injury, Your Honor, and that was dismissed. That theory of injury is precluded by the district court's decision in the motion. But that's still what you pled. Well, that's what we pled, and we pled an alternate theory, which was an overcharge. And with Rico, in the Rico section... Well, but if you pled that, then obviously you believe that to be true. Otherwise, as an ethical matter, you wouldn't have made that claim even as an alternative. That's right. Some of our named plaintiffs believe that to be true. They wouldn't have bought the ticket. And... It says none of the plaintiffs. That's right. At the time, well, we had additional named plaintiffs added, but I can speak for the ones that existed at the time when we filed the complaint. None of them would have purchased the tickets if they knew the truth. But it turns out we did a full study, and it's not a worthless ticket. It's a ticket worth maybe a few percent less than it should have been. And that's how discovery works. And we don't have any information at the complaint stage. We do have their subjective view, which doesn't matter under the current version of the case. It matters not at all what their expectations were about what they would pay for, what they wouldn't. Our burden, Your Honor, under this theory is to show an aggregate effect. Right? We have to show an aggregate effect on price and on demand. It doesn't matter if one person subjectively would have paid less or would have paid more. That wouldn't meet our burden here. And that's not the theory in which we proceed under. And so, Your Honor, that theory, what Your Honor just read, is deprecated. It doesn't work. It wouldn't work for the retail claim here. It couldn't show an overcharge. The only theory left, Your Honor, is that there was an overcharge, that there was a price inflation that was caused by the fraudulent conduct. Your Honor, should I proceed to the class issues, or? Sure. But, Your Honor, I do want to start with Dr. Allenby's model. And I know there are other elements, and there are other issues that have been raised, several of them under Rule 23. Well, I mean, is he the only evidence that you can rely on to show, I guess, the theory of an injury or damages that are gonna predominate as to the class? He's the key piece, right? That's right, Your Honor. He's the centerpiece at this point. And we suspected from the very beginning of this case that there was going to be skepticism. And that's why we did something very different here. And I looked at all the precedents that have appeared before this Court, in Curzon, Piggly Wiggly, I love saying that. Curzon, Piggly Wiggly, and all the other cases, including Bell, they're all proposed models. So there's someone who gives you the blueprint as to what he's going to do, and doesn't do it. We instructed Professor Allenby to do the full damages model. We said, do the conjoint, calculate the damages. Because there's proof is in the pudding. If I can show Your Honors that I have a percentage overcharge I have a percentage overcharge, and I can calculate it on a class-wide basis. And so he did that. Now, he's being faulted for having done the whole model, and I'll get to that in a second. But we have the whole model. He's got numbers. He shows demand and price inflation. And the defendants say, well, he did it wrong. There are pieces here that don't make sense. This doesn't add up. And the Court rejected all the arguments under Daubert, and the Court credited the model that he did. Now, there's another piece that is a proposal. It is a proposal. They said, well, what about the route-by-route variance? What are you going to do? They never mentioned this, but he wrote a supplemental report. And this is at Record 11-554. Professor Allenby says, if there are route-based issues, I can measure them with the data I get from my surveys. I can check to see if there's a skew, and I can adjust my overcharge. And how will I adjust my overcharge? I will use the sensitivity analysis that I already ran on other variables in my current model. I would augment it to include route-based data. That's what he says. He says this plain as day on 11-554. Now, this is not Piggly Wiggly, where we have someone show up and say, I'll do a regression. It doesn't explain why or how, how he's going to quantify it, where the data is going to come from. It's not Crouzon, where the expert, frankly, had no idea how to do life benefits or death benefits. We have an actual model to start from that did get to Class Y damages, that did survive Daubert, and then we have this delta that he's going to do with the merits that will handle the route-based variance. Now, as to that delta, did that survive a Daubert? Well, your honors, no one Dauberted the underlying methodology for his sensitivity analysis. No one. It's based on a logic model, a hierarchical logic model. No one said there was a problem with that model. So there's no dispute at this point that that model can be augmented. None. It's not even addressed in the briefs by the appellants. And so what do we have here? We have not just a blueprint. We have someone who did the entire thing. He tells you how he's going to fix it and deal with the route-by-route variance that they say will preclude class certification, and that's, for some reason, not enough. And it's very tough to say, well, what more do you need to do in order to show Rule 23 can be met? I mean, at this stage, this is the most any expert has done in this circuit at the class certification phase. I can say that I've looked at lots of cases. No one does the full analysis of the class certification, but we did. And I think that it's funny because they say, they use Prandtl, which is very strange, to say, well, if he did it now and he has to add or change it later, well, he can't do that under Prandtl. But that's not what Prandtl says. Prandtl was a proposed study. By definition, Prandtl would have had to have been done, the study there would have been done in merits. So the notion that Prandtl somehow freezes his work to what he did now, I don't know if that makes sense. Now, they do keep saying he's had two chances. What they mean, Your Honor, is he did the actual study, then he did a supplemental report to address their problems with it. That's what they mean by two chances. In reality, he did quite a bit of work. Yeah, he did it on the first shot, which almost no one does, because what if you get bad results? That's how much we believe in the case, that we thought, let's do it, let's see if we get damages, and we did. Now, the damages were statistically significant. Within a 95% confidence interval. That means the odds of falling outside of those damages ranges are tiny. Even if you measure over and over again on a route-by-route basis, still, the odds of that being material are tiny, and the experts said this to them. And we have that in the brief. He said this. This is very low, he doesn't expect any change the next time he runs it. And I don't either, but we are going to account for it. And he explains exactly how he's going to do it at merits. So, your honors, I don't think that Dr. Allamey's model is really so deficient that no class can ever be certified, and the case must be rendered below with an instruction that no class should ever be certified. I mean, there is the argument, your honor, and this is an interesting argument, which is the airline crisis is so, so complicated that you can't possibly account for an overcharge for lying about the safety of the plane that's mixed and matched throughout the entire fleet. And for one, your honor, the point that there's one overcharge is not correct. Professor Allamey broke it into two pieces. He looked at short-haul and long-haul flights. That is a bit of segmentation. It's not, it doesn't get you to route-by-route variance yet, but it's fair. He separated long and short-haul flights, and he said, well, I got 95% confidence in overall responses, and then he went and did this. He did a sensitivity analysis. He looked at gender, age, frequency of flying. Now, other variables that do affect route will co-vary with these variables. Someone who flies a lot, for example, is a very sophisticated purchaser, so you can see some of the other variables will co-vary. He didn't find any effects, so the odds of his study coming up and showing that some particular route is going to have some significant, massive variance, very low. Now, this is not a finding this court needs to have at the class certification phase. This is a merits question, but he can certainly have a class certified and show that that variance doesn't really change. What about variance across dates? Well, Your Honor. This is a period, class period, and did he find any variance across dates, and is that a problem? He didn't, and it's not clear precisely how his study as it exists segments any dates, and it's because there really is no reason. The information that's been kept secret is consistent across the class, so nothing is really varied. Now, there is one, to be honest with you, Your Honors, that there's a difference between pre-Lion Air and post-Lion Air to some extent because there's this press onslaught that happens in November of 2018, and we have one or two statements directed to the public at launch, which are very false, but the point is that the false statements about the safety of the plane are uniform during that period. At most, you'd have to segment pre and post-Lion Air, which is something that can easily be done with additional prompts in the final merits conjoint, so it's not something that's impossible to do. I do also want to note that they say, well, look, all these things go into the prize. The time you leave, how long the flight is, whether you get peanuts, but the problem, of course, is that we're starting the conjoint with the market price. It's a discount from the price they set. Why would all of that vanish suddenly? Because we're readjusting for lower demand. If it was a $100 ticket, they got there because they set a $100 ticket for that route, and maybe there's a route where they have a monopoly, and they charge $500, great. We have a percentage discount from $500, so why is it that their calculus suddenly vanishes simply because we're trying to readjust demand? And to zoom out, Your Honor, we're trying our best to get a reasonable approximation. We'll never know what the injury was. It's impossible to tell. You can't reconstruct precisely what happened. You can't reconstruct all of the supply-side forces, and as the district court noted below, you don't need to under conjoint, and we accepted our experts' view on that, and our peer-reviewed studies would say this, but you don't need to reconstruct all of that, but you can't. There's no case where I can, I have never been involved in a case where I could tell you precisely what the world looked like in this imaginary but-for world, and reconstruct all the pricing. That's not demanded under Comcast. You need a reasonable and fair approximation of the damages, and then in a RICO claim, where we're dealing with fraud, we have moral aptitude once you show fact of injury, and the Supreme Court has said this on numerous times, and Your Honor, Congress made it very clear that the very reason treble damages were included is because it's very hard to measure damages in cases like this, so better to overcompensate the victim, and so to come here and say, you can't precisely tell me how much the price would have varied if we gave you more peanuts, and so you can't have a class action, doesn't make any sense. It's not, doesn't comport with the statute, and frankly, it's unrealistic. There would be no fraud cases against Southwest Airlines, and I'm sure they'd love that, but that's not, that doesn't work. You have to have an ability to measure damages. You do the best you can. They're not going to be precise, and at the end of the day, the jury may reject them. The jury may look at these damages, may look at Professor Allamby's report, and his damages ranges, and how he got there and say, I don't buy it, just like they do. Jury may be skeptical. It's a jury question. That's not a question of whether or not we can do it. Here we are, a formula, mathematical formula with a plan, exactly how to deal with any variance that they propose that deals with the entire class. Now, they say, well, how can it be that the whole class has the same overcharge? That's skepticism. So, cross-examine them at trial. It's not that suddenly you can't, as a matter of law, possibly prove with a conjoint study that there was an overcharge, and frankly, Your Honor, no one's contending a uniform one. In fact, we already are segmenting them by route size, and we may segment them more after we adjust using the augmented sensitivity analysis that Dr. Allamby proposes at 11.554. Briefly, Your Honor, my time is running out. I've talked for quite a while, but I do want to flag the ascertainability issues. I do think there's somewhat of a red herring, at least the constitutional issues. The Seventh Amendment issues, for example, easily curable. The court can obviously just withhold final judgment until it administers the claims process, which happens in courts throughout the country in class actions. There's nothing new, nothing novel about that. If they wanted to have a jury trial on a $5 claims form, they could. Nothing violates due process there. And when we're dealing with aggregate damages, when we know the exact amount, overcharge times ticket, generally there's no due process interest in how the money is distributed to the class, and we do cite the McMullin's case on this point, and the Seventh Circuit, I think, goes through all the various possibilities, and Seeligson and his court favorably cite McMullin's. The other point I'd like to make, Your Honor, is, oh, I might let yellow lights on. The other point I'd like to make, Your Honor, is how do we tell who's in what class? Well, how do we know if you bought a ticket, you weren't secretly reimbursed? You ask them. You say, well, were you reimbursed? You go on your little form, and they say, no. Great, come get your claim. If they say, oh, you were reimbursed, you're out. It's that simple. You don't believe them, ask them under oath. Make them sign an affidavit. This is quite common procedure throughout the entire country. It's not a reason to defeat a class. Now, is a reimburser, does that reimburser have standing here? I don't know, and the court didn't either. There's a directness requirement under RICO, under Holmes. There has to be one step up for RICO, and the thoughtful court saw this and split the classes, and because that's a merits determination, we're gonna have to hit later. So a lot of the asset-trainability issues that we're dealing with here about the reimbursers may never arise. It may well be that only first purchasers, like in the Illinois Brick Antitrust, only the first purchasers have standing, in which case, all of this goes away, but the court has to have a chance to reach that merits question. As this court said in Seeligson, we just have to be able to tell at some point who's in what class, and this is not the point to foreclose a class simply because there are merits issues that will have to resolve what the classes look like down the road. With that, Your Honor, if you honors have any other questions, I can rest on my argument, but. All right, thank you, Mr. Battaglia. Thank you, Your Honor. Mr. Jay, for Rub, for Butta. Thank you, Your Honors. Just a few points, and Judge Oldham, you asked me in the top side of the argument about case law on that consumable good point. Johnson & Johnson covers that at page 281, so I wanted to make sure to get you that citation. So what do you do about the supplemental report that was referred to? So I'm glad you brought that up, Judge Smith, because the number one thing I want you to remember about the supplemental report is that his deposition comes after the supplemental report. So he's posed after the supplemental report, and he's asked all these questions. Do you know what you would do to address route-by-route pairs? No, I don't know what questions I would ask. I don't know what results I would produce. I imagine that they would vary. I don't know how much. And he was even asked a leading question, so leading we objected to it, by his own counsel at deposition. Are you confident that you could show a positive overcharge on every route? And he said he couldn't show that. He couldn't be confident with that. And let's take a step back for a moment. Recall that Dr. Allenby said himself that his model was flawed. It produced counterintuitive results because it showed that people would pay more to fly on a MAX after being read these messages that were written by the plaintiff's counsel. So he acknowledged that his model was flawed. He acknowledged that changing the model would change the outcome. And he acknowledged that he has no plan, no plan to model the effect route by route. All he said he could do was he would try and do some sampling. He would try and randomly choose some routes and he'd come up with a model that would attempt to do the survey for the sampling of routes. But he acknowledged he could not do this conjoint methodology on all of the routes that the airlines fly. And that's what the market is. That's where the airlines compete. If there were market effects, that is where they would be felt. And so that really fundamentally is the problem. The idea that this is just a jury question and it goes to weight, not admissibility, that really flies in the face of this court's case law. And one case that my friend did not mention is Bell Atlantic. Bell Atlantic says that the damages model, it can't just be a number, it can't just be a formula. It has to be a formula that provides a fair approximation of the actual damages felt across the class. What did Dr. Allenby say? He said that he did not have even a reasonable approximation yet. Page 11631 of the record. So I think Dr. Allenby acknowledges that he has at most a hope. He has not done the model. He has not constructed the model. So we're not disagreeing with the fact that under Comcast, you don't have to provide your trial evidence, but you have to construct the model that shows you'll be able to do it reliably at trial. You don't have to put the inputs into the machine and display what the output is, but you've got to construct the machine. This machine has not been constructed. And fundamentally, as the Supreme Court said in I believe footnote five of Comcast, what the data, whether it's an econometric model or a conjoint model, what it shows and what it can prove, that is no more a legal question than what the court's own opinions say. Sorry, that is no more a factual question than what the court's own questions say. Compliance with Comcast, that's a legal question. That's for this court to decide. And it should absolutely decide that it has not been shown and that it cannot be shown because they have had multiple shots. They had their airline expert who couldn't truthfully say that it could be shown class-wide and they had two reports from Dr. Allenby and a deposition from Dr. Allenby. And I urge the court to look at the admissions he made at the deposition. Now I realize that I'm doing standing after predominance, which is out of order, but just a couple of words about standing, which is that I think it's my friends on the other side who are urging the court to do something unprecedented, not only contrary to its own precedent in Rivera and providing a roadmap to get around Rivera. It is at least counterintuitive to think that Boeing and Southwest conspired to come up with a way for American to charge more for people to fly on an Airbus. But that really is the theory here. And in order to show that each individual in the class is injured, they've got to plead non-speculative facts to show that they are among the injured. They can't just hypothesize and allege an overcharge at the Rule 12 stage. My friends put a lot of emphasis on the fact that he says they've stated a RICO cause of action, but as the court well knows, pleading the elements of the cause of action doesn't mean you have Article III standing. Now they do merge to some degree in this case because injury to business or property, yes, that's an element of the cause of action. But what this court does on appeal is the jurisdictional question. And they have to allege injury in fact with something more than just speculation. There's no way that in their pleadings and there's no way in Dr. Allenby's report to connect anyone in this class to having paid an overcharge because he can't connect his assumed industry-wide, segment-wide overcharge, which he just assumed would be uniform, he can't connect that to the price that any ticket purchaser paid, even if he could do it for the name plaintiffs, he certainly can't do it class-wide. And the defense would be entitled to challenge on a route-by-route basis everything that he says. That would swamp predominance and that is why a class cannot be certified. So for those reasons, we urge the court to reverse, to render judgment on the basis of standing or in the alternative to rule that this case cannot proceed as a class action. Thank you, Your Honor. Thank you, Mr. Jay. Your case is under submission and the court is in recess until nine o'clock tomorrow. Thank you.